# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR408-100 |
| | ) | |
| ALFREDO FELIPE RASCO, NIURKA | ) | |
| RASCO, RICCY MEDEROS and IRIS | ) | |
| OSWALD | ) | |
| | ) | |
| Defendants | ) | |

## O R D E R

Before the Court in this Medicare fraud case are the following defense motions: joint motion to dismiss counts 1-31, or, alternatively, for a Bill of Particulars, doc. 36; Alfredo Rasco's motion to sever, doc. 50; a joint motion, by Alfredo Rasco, Niurka Rasco, and Riccy Mederos (who has since pled guilty), to dismiss counts 2-77 of first superseding indictment, doc. 54; Alfredo Rasco's motion to amend a previous motion (doc. 67), doc. 77 (styled as a "notice" but which in fact "moves for leave to file" a document); and Alfredo Rasco's motion for return of property.

Doc. 128. As will be further explained below, two other motions were erroneously denied and, when combined with various "amendment" and "correction" filings, form the core motion here, which is Alfredo Rasco's motion dismiss the indictment because, he contends, the government violated Fed. R. Evid. 410 by using against him information gleaned from his guilty-plea proffers. Alternatively, he seeks to exclude tainted evidence arising from the violation. Doc. 67 at 4.

## I. BACKGROUND

Some factual background, per the original indictment,[1] informs the core motion. The first (June 6, 2008) indictment ran only against Alfredo and Niurka Rasco. Doc. 11. It alleges -- and for the purposes of resolving the instant motions, all indictment allegations are accepted as fact -- that in 2005 the two of them set up a Medicare provider,[2] "United

---

[1] There have been a total of four: doc. 11 ("Indictment"); doc. 38 ("Superseding Indictment"); doc. 118 ("Second Superseding Indictment"); doc. 137 ("Third Superseding Indictment"). For a short time the government ran a separate case against co-defendant Mederos, *United States v. Mederos*, No. CR408-232, doc. 6 (S.D. Ga. Sept. 12, 2008), but later dismissed it and added her to this case by way of a superseding indictment. Doc. 38. In that sense there have been a total of five indictments on the same overall subject matter.

[2] As the indictment further explains, Medicare

Therapy," in Savannah, Georgia, with Alfredo as its owner-president. *Id*. at 1-2. A month later, Alfredo, aided by others, had United Therapy submit fraudulent bills to Medicare for infusion therapy. Niurka did the same thing for a second entity called United Medical Center, Inc. (with her as its owner), also in Savannah. Through March 2008, the two submitted over $5,600,000 in false medical services claims to Medicare, thus violating 18 U.S.C. §§ 371 (Conspiracy) and 1347 (Health Care Fraud), and supporting a criminal forfeiture allegation under 18 U.S.C. §§ 982(a)(1), 982(a)(7), and 982(b). Doc. 11 at 3-5. The services either were never provided under the supervision of a physician, or were

---

is a national healthcare benefit program which funds certain healthcare services provided to the elderly, blind and disabled. Claims from healthcare providers are processed on behalf of Medicare by companies who contract with the United States Department of Health and Human Services to provide administrative services. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services. In order to bill Medicare, one had to be an approved Medicare provider. A provider obtained this approval by submitting an application to CMS. If the applicant met certain minimum qualifications, Medicare approved the application. The provider was issued a unique identification number called a "provider number." The provider was then able to submit bills, known as "claims," for payment to Medicare. CMS contracts with various private insurance companies to serve as its fiscal intermediaries and carriers. Cahaba Government Benefits Administrators ("Cahaba") serves as the Medicare Part B Carrier for the State of Georgia.

Doc. 11 at 1-2.

overstated. *Id.* at 6-12. The two also committed identity theft by misappropriating personal provider information from medical doctors in order to submit the fraudulent medical bills to Medicare. *Id.* at 5-6, 12-15.

In the First Superseding Indictment (hence, the second indictment, filed October 9, 2008), the government added defendant Riccy Mederos (the "infusion queen," doc. 127 at 12, 32), who owns "Florida Quality Associates, Inc." (FQI) in Miami, Florida. Doc. 38 at 1. This indictment basically restated the original's allegations but also revealed Mederos's involvement, alleging that between 2005-2008 the three "opened several purported health care clinics throughout South Georgia for the purpose of submitting fraudulent bills to Medicare relating to claimed infusion services." *Id.* at 3. Mederos and Alfredo, for example, both submitted United Therapy's Medicare Provider enrollment application. *Id.* She also assisted Alfredo in billing for services under doctors' names and authorization numbers without those doctors' knowledge. *Id.* at 4-5. Mederos also aided and abetted Niurka's misuse of United Medical to defraud Medicare. *Id.* at 6.

By this time, then, the government had learned about, and thus indicted Mederos for, similarly using (along with the Rascos) "Savannah Medical Services" (SMS), by fraudulently billing Medicare while identity-thieving a doctor's Medicare ID. *Id*. at 2, 6-8. The three did the same for "Longevity Care Services" (Longevity). *Id*. at 2, 6-10. Mederos and the Rascos were thus indicted for conspiracy on those schemes, *id*. at 10-17, along with Health Care Fraud, 18 U.S.C. § 1347, *id*. at 17-26, with just Alfredo and Mederos on three Aggravated Identity Theft counts, 18 U.S.C. §1028A, *id*. at 26-27, 28-29, and Mederos alone on two separate Aggravated Identity Theft counts. *Id*. at 27-28. The government also charged Niurka with making a false statement to an FBI agent, *id*. at 29, and renewed its forfeiture allegations against the Rascos, only this time adding Mederos, too. *Id*. at 29-30.[3]

Since that time Mederos has pled guilty, doc. 106, and the government has filed two more superseding indictments. Hence, a total

---

[3] Brief mention is made of Continium Care Solutions, Inc., and Longer Life Services of Georgia, doc. 38 at 2, 34, though it appears that Mederos was the prime mover behind the Medicare fraud alleged in conjunction with those entities, as the government says only that she was "aided and abetted by others." *Id*. at 24 ¶ 22.

of four indictments have been handed down thus far in *this* case.[4]  Doc.
11 ("Indictment"); doc. 38 ("Superseding Indictment"); doc. 118
("Second Superseding Indictment"); doc. 137 ("Third Superseding
Indictment").   Meanwhile,  a confusing mix of motions remains on the
Court's docket.   Evidently to avoid motion-filing deadline cut-offs, the
Rascos filed "amendments" to earlier motions, thus confusing court staff
to the point that two motions were erroneously terminated.   The Court
will thus revive them, but to understand even that much requires some
additional procedural history.

### A.  Motion to Dismiss Counts 1-31 (Original Indictment)

In a routine criminal motion, Alfredo and Niurka move to dismiss
counts 1-31 of the *original* indictment as too vague because the counts
failed to specify any false claim or any particular falsity in any claim
submitted.  The government, they complain, failed to even furnish them
with a copy of a false claim.  Doc. 36 at 3.  And counts 1-31, they contend,
are also duplicitous, in that they charged two or more separate offenses

---

[4] Five, if the temporarily separate *Mederos* case indictment is counted.  *See supra* n. 1.

in a single count. "In the event a jury returns a general verdict of guilty on any of the said counts, it would be impossible to determine whether the jury found that the defendants had billed for services that were not medically necessary, had billed for medications that were not administered to the patient, or had failed to comply with some unspecified regulation requiring medical supervision of the service for which the claim was submitted." *Id.* at 4. Hence, they conclude, these counts are impermissibly duplicitous. *Id.*

## B. Motion to Sever

Alfredo has filed a Fed. R. Crim. P. 14 motion to sever. Doc. 50. There he notes that, as of the November 14, 2008 date of his motion, the government had not provided him with the substance of statements of the respective defendants that may be introduced at trial. *Id.* at 2. He anticipates, however, that the government would attempt to introduce in its case-in-chief the statements he made during two proffer sessions. *Id.* He promises a separate motion in limine on that score, and on top of that plans to use co-defendant statements to exculpate himself (and requested leave to submit them ex parte). *Id.* at 2-3. Granting him a severance and

thus a separate trial was necessary, he argues, so that a co-defendant would so testify. *Id.* at 3.

## C. Joint Motion to Dismiss Counts 2-77

Before the Court could reach motion 36 (to dismiss counts 1-31), the government filed the superseding indictment (doc. 38) described above. Moving to dismiss counts 2-77 of that charging document, Alfredo and Niurka basically re-argue Alfredo's first motion to dismiss, raising the same "duplicitous" arguments. They alternatively move for a bill of particulars setting forth more details behind the allegations. Doc. 54.

## D. Motion to Dismiss Based on a Rule 410 Violation

Rather than simply file a motion to dismiss, Alfredo moved to amend docs. 36 and 54 on December 15, 2008, this time inserting a new defense theory into the case: that the government violated Rule 410 of the Federal Rules of Evidence when it impermissibly used against him information that it learned from him during two plea-bargaining "sit-

downs" held on May 30, 2008 and August 26, 2008.[5] Doc. 67. He then filed a "Corrected Amendment" to that amendment, doc. 68, followed by an amendment to the corrected amendment, doc. 70, then a supplemental exhibit to all of that. Doc. 77. Again, he *could* have simply filed a separate, "Rule 410" motion, rather than drag the Court (and its docketing clerks) down a needlessly complicated series of amendments, corrections, and supplements.

---

[5] Rule 410 provides in relevant part:

Except as otherwise provided in this Rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

\*   \*   \*   \*

(4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea discussions has been introduced and the statement ought to, in fairness, be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

No one contends that the two "however" exceptions (i.e., subprovisions (i) or (ii) above) are in any way applicable here. Fed. R. Crim. P. 11(f) ("Admissibility or Inadmissibility of a Plea, Plea Discussions and Related Statements"), by the way, says it is "governed by Federal Rule of Evidence 410" and thus the case law construing it is freely cited to construe Rule 410.

In any event, his seminal Rule 410 filing reveals that he is moving to amend the previous motions (docs. 36 and 54) discussed above, and he also moves *in limine* to keep his Rule 410/plea-bargaining proffer statements out of any trial. (Apparently this is a hedge should the Court fail to dismiss the indictment against him outright; Niurka does not join in this motion.) In motion doc. 70, Alfredo sought to amend his doc. 68 motion by swapping out two paragraphs. And in a later filing, he called his motion a "Motion in Limine to Exclude Proffer." Doc. 71; *see also* doc. 77 (moving for leave to file additional supplementary exhibits).

Adding yet another layer of complexity, the government next filed a *second* superseding indictment (hence, its third indictment in this case), doc. 118, in response to which Alfredo renewed his Rule 410 motion, contending that "the grand jury testimony supporting the Second Superseding Indictment also used statements from Rasco that he provided in his meetings with the government." Doc. 123 at 2. The Court heard argument on that and other motions on August 31, 2009. Doc. 125. In a post-hearing minute order, it then denied various

motions, including -- erroneously, it turns out -- motions 68 and 70, since it had not yet ruled on the "Rule 410" issue. Doc. 126.

Those last two motions are revived here since, fairly read, all of the filings found at docs. 36, 54, 67, 68, 70 and 77, as consolidated, constitute a motion to dismiss/exclude based on the alleged Rule 410 violation. *See also* doc. 71 (notice of filing attached superseding indictment, grand-jury transcript); doc. 123 (Alfredo's supplemental brief renewing his motion in light of Second Superseding Indictment filed at doc. 118); doc. 127 (hearing transcript); doc. 132 (Alfredo's post-hearing brief); doc. 136 (government's reply); doc. 137 (Third Superseding Indictment discussed *infra*); doc. 145 (Alfredo's supplemental brief).

## II. ANALYSIS

### A. Governing Standards

Rule 410's protections are best demonstrated by assuming a defendant: (a) sits down and negotiates with a prosecutor *without* any written plea-proffer protection agreement; then (b) fails to cut a deal; then (c) gets indicted; and then (d) moves the court to dismiss the indictment because it was based on the statements that he provided

11

during those plea negotiations. Under those facts, the Court would apply Rule 410 based on its purpose, which is the "promotion of disposition of criminal cases by compromise." *See* Fed. R. Evid. 410 Advisory Committee's Notes, quoted in *United States v. Mezzanatto*, 513 U.S. 196, 206 (1995).

To advance that purpose, the Rule protects a defendant's plea-offer statements even during negotiations that occur without a written protection agreement; it prevents the government from *directly* using those statements against him at trial. *See United States v. Sylvester*, 583 F.3d 285, 288 (5th Cir. 2009) ("Ordinarily, under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f), statements made by a defendant during plea negotiations are inadmissible at trial.") (footnote omitted); *United States v. Quiroga*, 554 F.3d 1150, 1154 (8th Cir. 2009) ("Under Rule 410, statements made in the course of plea negotiations are inadmissible against the defendant."); *United States v. Artis*, 261 F. App'x 176, 177 (11th Cir. 2008) ("'[A]ny statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty' is not admissible as

evidence in a criminal trial. Fed. R. Evid. 410."); *United States v. Jimenez-Diaz*, 659 F.2d 562, 568 (5th Cir. Unit B 1981) ("As for Salazar's contention that his statement was part of a plea negotiation and therefore inadmissible under Fed.R.Crim.P. 11 and Fed.R.Evid. 410, we note that these rules apply only to statements made in the course of plea negotiations, i.e., discussions (that take place) in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions.") (quotes and cites omitted).

While those cases speak of the admissibility of Rule 410-protected statements at *trial*, the Rule expressly prohibits admission of such statements "in any civil or criminal proceeding" against a defendant who engaged in plea negotiations. Fed. R. Evid. 410. The same rationale is applied to immunized plea discussion statements that find their way into grand jury proceedings. *See United States v. Pielago*, 135 F.3d 703, 707-08 (11th Cir. 1998) (reaching, on plain-error appellate review, defendant's denied "motion to dismiss [a] superseding indictment on the ground that the government had used her [immunized] statements

against her before the grand jury in violation of her proffer agreement") The Rule even reaches, one court has held, preliminary "sit-downs" with the government -- "to see if the defendant had enough information to interest the government in starting plea negotiations. . . ." *United States v. Ross*, 588 F. Supp. 2d 777, 783 (E.D. Mich. 2008).

However, while Rule 410 and its substantively identical counterpart, Fed. R. Crim. P. 11(f), require the suppression of "statements" made in the course of plea discussions, they do not speak to, much less bar, evidence the government *derives* from such statements. Indeed,

> [e]very federal court to have considered the issue has similarly found that FRE 410 and FRCrP 11(f) do not require suppression of *derivative* evidence. . . . *United States v. Cusack*, 827 F.2d 696, 697-98 (11th Cir.1987); *United States v. Millard*, 235 F.3d 1119, 1120 (8th Cir.2000); *but see United States v. Ankeny*, 30 M.J. 10, 14-15 (C.M.A.1990) (holding substantively identical provision of the Military Code of Evidence, Mil. R. Evid. 410 should be "broadly construe[d]" to require the suppression of derivative evidence in order "to encourage plea negotiations"); WEINSTEIN'S FEDERAL EVIDENCE § 410.09[4] (Joseph M. McLaughlin, 2d ed. 2005) ("It would seem that, to enforce the policy underlying Rule 410, the better approach would be to import the 'fruit of the poisonous tree' doctrine into this area.").

*United States v. Stein*, 2005 WL 1377851 at * 14 (E.D. Pa. June 8, 2005) (emphasis added); *see also United States v. Rutkowski*, 814 F.2d 594, 598-99 (11th Cir. 1987) (per curiam); *United States v. Reaves*, 2009 WL 1423907 at * 3 (N.D. Fla. May 3, 2009) (unpublished) ("Because the defendant's September 3, 2008, statements were made as part of a plea negotiation under Rule 11(f), the Court holds that those statements are inadmissible at the defendant's trial, except as otherwise provided under Federal Rule of Evidence 410. As for any evidence *derived* from those statements, the Court holds that Rule 11(f)'s exclusionary rule does not apply.") (emphasis added).

This area of law is laced with some subtlety, and that shows up in the parties' briefs in this case. Rasco relies heavily on cases addressing the government's use of *immunized* grand jury testimony where "direct *and* indirect" use language is found, and it is useful to review those standards since they bear some application here. Those cases highlight a core reality: When a defendant makes incriminating statements to the government under a grant of immunity (whether to agents or via subpoenaed grand jury testimony), he in effect is testifying against

himself -- thus implicating Fifth Amendment protections. *United States v. Hampton*, 775 F.2d 1479, 1484-85 (11th Cir. 1985). When that Fifth Amendment line is crossed with otherwise-protected testimony, a steep burden is imposed on the government to show that it indicted the witness based on wholly independent, non-derivative evidentiary sources.

One such case, *United States v. Schmidgall*, 25 F.3d 1523 (11th Cir. 1994) ("*Schmidgall I*"); *see also United States v. Schmidgall*, 25 F.3d 1533 (11th Cir. 1994) ("*Schmidgall II*"), somewhat blurs this line and not surprisingly Rasco exploits it. There the government granted the defendant "use" and "derivative use" (but not "transactional") immunity[6] during sit-downs, *id.* at 1526, and wound up facing an appellate remand to prove, under *Kastigar v. United States*, 406 U.S. 441

_____

[6] One commentator explains that

> [b]asically, there are two kinds of immunity: "Transactional" and "use and derivative use." Under the former, the witness may never be prosecuted for the offense to which the immunity relates; under the latter, the witness' testimony may never be used against the witness in a subsequent prosecution. Under a statute authorizing "use and derivative use" immunity, the witness may still be prosecuted for the offense to which the compelled testimony relates. However, the prosecution would have the burden of proving that the evidence it proposed to use was derived from a legitimate source wholly independent of the compelled testimony.

1 WHARTON'S CRIMINAL LAW § 80 (15th ed. 2009) (quotes and footnotes omitted).

16

(1972), that its grand jury evidence against Schmidgall came from wholly independent sources. 25 F.3d at 1532; *see also id.* at 1531 n. 10 (where the record shows irreparable taint, courts terminate the prosecution outright; close cases warrant full *Kastigar* hearings). *Schmidgall I* thus crosses over somewhat into Rasco's realm, even though, initially, there was only an informal sit-down in this case and the government did not explicitly grant any sort of immunity. Indeed, Rasco's first (May 30, 2008) sit-down did not even involve a written agreement. Thus, his only Rule 410 protection at that juncture was limited to the *direct* use of his statements at trial or before a grand jury. There was *no* protection against the government's derivative use of what he then disclosed.

Still, the *Hampton/Kastigar* analytical framework applied in *Schmidgall I* is instructive because it informs the Court's analysis on Rasco's second (August 26, 2008) sit-down, which did involve written protections analyzed *infra*. In *Schmidgall/Kastigar* cases, the burden is placed on the government to protect the defendant's Fifth Amendment right against self-incrimination. Thus, the government must demonstrate, by a preponderance of the evidence, a wholly independent

and legitimate source of all evidence introduced to the grand or petit jury. *Schmidgall*, 25 F.3d at 1528-29; *Hampton*, 775 F.2d at 1484-85; 1 WHITE COLLAR CRIME § 6:19 (*Subsequent prosecution*) (2d ed. 2009). In such situations, the government thus must show that its grand jury presentation against the defendant came from independent sources, and *no* direct or indirect use of his statements is permitted. *Kastigar*, 406 U.S. at 460 (if one is compelled to give testimony under a grant of immunity from the use in any criminal case of such testimony or any evidence derived therefrom, and yet is subsequently prosecuted for an offense to which that compelled testimony relates, the prosecution must negate the taint and prove that all of the evidence it intends to use is derived from a legitimate source wholly independent of the compelled testimony); *Schmidgall II*, 25 F3d at 1537 (*Kastigar* showing met by "[p]roof of government's reliance on information gathered prior to the taking of immunized testimony. . . .").

Such a defendant's rights are thus violated if the prosecution presents witness testimony that has even been shaped, directly or indirectly, by his immunized statements. This is true regardless of how

or by whom the witness was exposed to that information, since prohibited immunized testimony cannot help shape the questioning of another witness. *Schmidgall I*, 25 F.3d at 1228. Nor can the government use protected (i.e., immunized) communications or testimony "as an investigatory lead," *Schmidgall II*, 25 F.3d at 1537 (quotes and cite omitted); *Hampton*, 775 F.2d at 1485.

On top of all that, mere denials by prosecutors and government agents that they have not misused the defendant's information is not enough under *Kastigar*. *Schmidgall I*, 25 F.3d at 1228; *Hampton*, 775 F.2d at 1485; 1 TESTIMONIAL PRIVILEGES § 4:55 n. 8 (3d ed. 2009). Instead, the government must literally trace its "new" evidence to an independent source and show that fact:

> Indeed, aside from conclusory allegations of reliance upon the unimmunized statements . . . and conclusory denials of use or derivative use by various state and federal officials, the government made little effort to affirmatively trace each item of evidence that may have been considered by the indicting grand jury to legitimate, wholly independent sources. Obviously, the government's conclusory denials of direct or derivative use are insufficient even to "negate taint," much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources.

*Hampton*, 775 F.2d at 1487.

Nor can the government "back-door" protected testimony or "plea-speak" through a downwind-indicted, co-conspirator:

> Where the testimony of an immunized witness enables the government to build a case against his co-conspirator, who consequently strikes a plea bargain with prosecutors and agrees to testify against the immunized witness, the testimony of the co-conspirator must be deemed to have been *indirectly derived* from the testimony of the immunized witness in violation of *Kastigar*. *See United States v. Kurzer*, 422 F.Supp. 487 (S.D.N.Y.1976). Were this not so, a witness whose testimony was compelled through a grant of immunity would not be left "in substantially the same position [vis-a-vis the government] as if the witness had claimed the Fifth Amendment privilege," and his Fifth Amendment rights would therefore be violated. *Kastigar*, 406 U.S. at 462, 92 S.Ct. at 1665.

*Id.* at 1488 (emphasis added). Indeed, the government's indictment must be 100% taint-free; one rotten apple can spoil the entire barrel:

> Based upon a review of the entire record on appeal, and particularly the transcripts of the *Kastigar* hearing, it appears that the government labors under the misapprehension that it can satisfy its obligations under *Kastigar* merely by establishing independent sources for a *portion* of the evidence that may have been considered by the indicting grand jury and utilizing conclusory denials of use *or derivative use* mouthed by state and federal officials to fill in the numerous evidentiary holes that remain. We take this opportunity to disabuse the government of this faulty notion. *Kastigar* and its progeny require dismissal of an indictment of a previously immunized witness unless the government can demonstrate that "*none* of the evidence presented to the grand jury is derived, directly or indirectly, from the

> immunized testimony...." *See United States v. Byrd*, 765 F.2d at
> 1530 (emphasis supplied).

*Hampton*, 775 F.2d at 1489 (emphasis added). Still, "[n]egation of all

abstract possibility of taint is not necessary." *Schmigdall I*, 25 F.3d at

1529.[7] And, even if some taint is shown, "an indictment or conviction

may be upheld on a finding that the use of such tainted evidence was

harmless beyond a reasonable doubt." *Id.*; *Schmidgall II*, 25 F.3d at

1539 (government failed to prove a statement made to the indicting

grand jury was not tainted, but "the limited use of this information . . .

was harmless beyond a reasonable doubt."); *Hampton*, 775 F.2d at 1489

n. 51.

---

[7] As for meeting its *Kastigar* burden, *compare United States v. Dynalectric Co.*, 859 F.2d 1559, 1579 (11th Cir. 1988) ("The government convincingly demonstrated an independent source for all portions of the evidence adduced before the indicting grand jury and at trial against [defendant] which conceivably had any relation to his immunized testimony. The government's evidence showed that [defendant]'s immunized testimony was not used as a direct evidentiary source or as a source of investigatory leads."), *with Schmigdall I*, 25 F.3d at 1529 (government failed to prove that Customs special agent did not use notes of immunized interview with defendant to shape his questioning of defendant's coconspirator or other witnesses, or prove that agent did not obtain and use tainted information from other agents, as required to show that agent's grand jury testimony was not tainted within meaning of *Kastigar*, particularly given confusion as to time period during which another district was responsible for prosecuting matter).

Finally, time erodes both human memory and evidence. "Erosion risk" falls upon the government, not the defendant: "Under *Kastigar*, the risk that misinformation, procedural inadvertence or the lapse of time will make it difficult or impossible to establish a completely independent source for all of the evidence presented to the indicting grand jury is a risk that falls upon the government, and not upon the previously immunized defendant." *Hampton*, 775 F.2d at 1491.

Prosecutors routinely seek to avoid the above burdens and complications by demanding that a defendant waive his Rule 11, Rule 410, and *Kastigar* rights. *See Mezzanatto*, 513 U.S. at 209 (such waivers are enforceable)[8]; *Sylvester*, 583 F.3d at 288 (prosecution could use

---

[8] Note that

*United States v. Mezzanatto*, 513 U.S. 196 (1995), addressed the validity of Rule 410 and Federal Rule of Criminal Procedure 11(e)(6) (now Rule 11(f)) waiver that would render defendant's statements made in the course of plea discussions admissible. The Court held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Id.* at 210. Though the holding in *Mezzanatto* was limited to impeachment use, *id.* at 211 (Ginsburg, J., concurring), some courts have extended this holding to enforce case-in-chief waivers.

*United States v. Alazzam*, 2009 WL 3245392 at * 3 (E.D. Va. Sept. 29, 2009) (unpublished). The government in this case seeks to enforce a case-in-chief waiver.

22

defendant's statements made in the course of plea negotiations in its case-in-chief, when the defendant, as a condition to engaging in negotiations with the government, knowingly and voluntarily waived all rights to object to such use); *United States v. DeLaurentiis,* 638 F. Supp. 2d 76, 75 (D. Me. 2009); *United States v. Mitchell*, 2009 WL 1393138 at * 4 (D. Utah May 18, 2009). The case law furnishes other prophylactics. *See, e.g., United States v. Byrd*, 765 F.2d 1524, 1532 n. 11 (11th Cir. 1985) (warning that it is unwise to permit an attorney familiar with immunized information to participate in the prosecution).

## B. Lassoing The Arguments

The dismissal/exclusion arguments here, as spread across multiple dismissal filings (*see, e.g.*, doc. 36, 54, 68, 70 and follow-up briefs) are difficult to rope down because of the ad hoc way in which they have been presented: a brief was filed, followed by a "curative" superseding indictment, then another brief was filed, ad infinitum. Also, Alfredo's May 30, 2008 sit-down with the government was *not* covered by any

---

See Sylvester, 583 F.3d at 288 (prosecution could use defendant's statements made in the course of plea negotiations in its case-in-chief, when the defendant, as a condition to engaging in negotiations with the government, knowingly and voluntarily waived all rights to object to such use).

written agreement (or even an informal grant of immunity), while his second (August 26, 2008) sit-down was. Thus, there is a lot of argument concerning what was learned and thus can be freely used by the government regarding Alfredo's first sit-down versus his second.

To sort it all out, the Court first reviews a filing where Alfredo says that he inculpated himself and sought to exculpate his wife through a plea agreement:

1. [Alfredo] has made two proffers to the government [, one on May 30, 2008 and the other on August 26, 2008]. The circumstances of his first proffer, on May 30, 2008, were that he had been charged by a complaint and arrested whereas his wife had not; however the government had indicated that it planned to indict both him and his wife. [Alfredo] believed that if he truthfully informed the government of his own conduct and of his wife's lack of any knowing participation in the unlawful transactions, the government would subsequently agree not to prosecute his wife and would become amenable to entering into a reasonable plea agreement with him. *However, there was no agreement with counsel for the government at that time.* [Alfredo] and his counsel understood (without any discussion or agreement with the government) only that the government would simply listen to what [Alfredo] had to say and evaluate his information. . . . The proffer meeting was arranged at [Alfredo]'s request by his counsel who contacted the Assistant United States Attorney for that purpose. After this proffer, Defendant and his wife were indicted on June 6, 2008. [Doc. 11]

Doc. 70 at 1-2 (emphasis added). On those facts as alleged (but not Alfredo's beliefs) thus far the parties agree. And there is no dispute that all Alfredo enjoyed at this juncture was Rule 410 protection against direct use of his statements. They diverge, however, on the following assertion about how Alfredo's information was used:

> 2. The grand jury which returned the [first] superseding indictment [doc. 38, filed October 9, 2008] in this case heard testimony regarding [Alfredo]'s proffers to the government on at least two occasions: the sessions of Sept. 10-11, 2008 and the session of October 8, 2008. After hearing evidence during the September sessions, the grand jury returned [a separate] indictment against Riccy Mederos [in *United States v. Mederos*, CR408-232 doc. 6 (S.D.Ga. Sept. 12, 2008)].[9]  After hearing additional evidence at the October 8th session, the same grand jury returned the above-captioned superseding indictment against Defendants Mr. and Mrs. Rasco and Ms. Mederos. [Doc. 38]. Disputes have arisen between Defendant Rasco and the government as to the government's use of his proffer statements, the content and truthfulness of those statements, and what statements were made at each of the proffer sessions.

Doc. 70 at 1-2 (footnotes added).

---

[9] As noted *supra* n. 1, the government later dismissed the *Mederos* case and added Mederos to this action. On June 22, 2009, Mederos pled guilty to the first superseding indictment (doc. 38) counts 15 and 25. Docs. 106 & 107.

The government does not dispute the core facts regarding the date of Alfredo's two proffer meetings with it (May 30 and August 26, 2008). Nor is there any dispute that Alfredo's second (August 26, 2008) sit-down with the prosecutor was preceded by a waiver agreement. The three operative paragraphs of that letter agreement provide that, if the plea negotiations led to no guilty plea, the government could, in limited fashion, use what Alfredo told it:

> **4. No Direct Use**: The government agrees that statements or information contained in your client's proffer may not be used in the government's case-in-chief against your client should a trial be held.

Doc. 68-3 at 3. Thus far, then, the government could use Alfredo's statements only to impeach him should he testify, and as noted *supra*, courts have upheld case-in-chief waivers. But the government did not stop there. It next got Alfredo to agree to:

> **5. Derivative Use:** The government may make derivative use of, and may pursue investigative leads suggested by, my statements or information provided by your client's proffer. This provision is necessary to eliminate the necessity of a *Kastigar* hearing wherein the government would have had to prove that the evidence it sought to introduce at trial or in a related legal proceeding is derived from "a legitimate source wholly independent" of statements or information from the proffer.

*Id.*

Thus, the government obtained Alfredo's consent to the whipsaw found in *Pielago*, as decried by the dissent in that case, wherein the government simultaneously promised not to *directly* use what it learned from the plea-negotiating defendant yet could also *indirectly* use what it learned from her. *See Pielago*, 135 F.3d at 710-11; *see also id.* at 71 (dissent insisted that such interpretation was contradictory, then proffered a more harmonious replacement).

Alfredo's defense lawyer, however, successfully negotiated the following into the agreement:

> **6. Perjury and Other Offenses:** Provided that you give truthful and complete statements, no information or documents which you disclose will be used against you, *directly or indirectly*, in a criminal case. . . .[10]

Doc. 68-3 at 3 (emphasis added).

Therein lies the rub: ¶¶ 4-5 say the government *can* make both direct use (for impeachment purposes only) and indirect use of information learned from Alfredo during his August 26, 2008 plea-

_____

[10] Alfredo contends that ¶ 6's use of the phrase "criminal case" includes grand jury proceedings prior to the filing of an indictment. Doc. 127 at 12-13. The government does not dispute this.

bargaining session, but ¶ 6 prohibits both.  At oral argument Alfredo's

counsel conceded that ¶ 5 is

> a very broad statement. It seems to cover civil and criminal use, or
> it's not limited in one way. And it also could be read to be applied to
> Mr. Rasco and to other people. [But w]hen you look at Paragraph 6,
> you see that Paragraph 6 qualifies the derivative use, and it's a
> qualifying provision of Paragraph 5; and in that statement it says
> that the government cannot use information or documents
> disclosed by Mr. Rasco against him, *directly or indirectly*, in the
> criminal case. So you see that language qualifying Paragraph 5.

Doc. 127 at 12 (emphasis added).

The Court notes that defense counsel negotiated ¶ 6 into the

agreement, *id.* at 20; *see also id.* at 19-20 (Court remarking: "I would

imagine the government won't be using this type of proffer agreement

again"), while the government evidently authored ¶¶ 4-5.  A preliminary

issue thus arises: whether the normal rule of contract construction --

that any ambiguity is construed against he who spawns it -- applies here.

In criminal cases involving proffer agreements courts start with general

contract principles:

> A proffer agreement is a contract and its terms must be read to give
> effect to the parties' intent. *United States v. Barrow*, 400 F.3d 109,
> 117 (2d Cir.2005) (*quoting United States v. Liranzo*, 944 F.2d 73, 77
> (2d Cir.1991)); *see also United States v. Williams*, 510 F.3d 416,
> 421-22 (3d Cir.2007) (stating that plea agreements are analyzed

"according to contract law principles"); *United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir.1998) ("Plea agreements, although arising in the criminal context, are analyzed under contract law standards.").

*United States v. Hardwick*, 544 F.3d 565, 570 (3rd Cir. 2008). But because due process concerns are also involved, *Mabry v. Johnson*, 467 U.S. 504, 509 (1984) (broken government promise that induced guilty plea implicates due process clause because it impairs voluntariness and intelligence of plea),

> [p]lea agreements . . . are [viewed as] "unique contracts" and the ordinary contract principles are *supplemented* with a concern that the bargaining process not violate the defendant's right to fundamental fairness under the Due Process Clause. "[B]oth to protect the plea bargaining defendant from overreaching by the prosecutor and to insure the integrity of the plea bargaining process, the 'most meticulous standards of both promise and performance must be met by [the government].' " *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978) (quoting *Correale v. United States*, 479 F.2d 944, 947 (1st Cir.1973)). Accordingly, even if a plea agreement is unambiguous on its face, courts may refuse to enforce it if the government is found guilty of overreaching.

*United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992) (cites and footnote omitted), *cited in* 5 WAYNE R. LaFAVE, CRIMINAL PROCEDURE § 21.2(d) (*The broken bargain*) (3d ed. 2009). As for the rules of contract construction when ambiguity is raised,

29

[i]t is a fundamental principle of contract interpretation that extrinsic evidence is inadmissible to prove the meaning of a contract that is unambiguous on its face. A contractual provision is ambiguous if it is subject to more than one reasonable interpretation. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1298 (7th Cir.1992), *cert. denied*, 506 U.S. 872, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992). Whether a contract is ambiguous or unambiguous on its face is a question of law and is subject to review de novo. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir.1986). "If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly." *Id*.

*Ingram*, 979 F.2d at 1184.

In this case even the government fails to proffer a rational interpretation of ¶¶ 4-6. The contract is unmistakably ambiguous. And the Eleventh Circuit has flatly stated that "*[a]ny* ambiguities in the terms of a written proffer agreement should be resolved in favor of the criminal defendant." *Pielago*, 135 F.3d at 709-710 (emphasis added) (citing *Rowe v. Griffin*, 676 F.2d 524, 526 n. 4 (11th Cir. 1982)). The *Pielago* court did not have cause to state whether a different rule applies where defense counsel's input figures into the agreement, as is the case here. But given the due process aspect, "derelictions on the part of defense counsel that contribute to ambiguities and imprecisions in plea agreements may *not* be allowed to relieve the Government of its primary

30

responsibility for ensuring precision in the agreement," *Harvey*, 791 F.2d at 301 (emphasis added), since the validity of a plea in the final analysis depends upon the voluntariness and intelligence with which defendant (not his counsel) enters into it. *Id.* at 303.

In *Harvey*, a prosecutor's promise that the defendant would not be prosecuted further for violations "arising from" the investigation leading to the indictment, barred such prosecutions even in other districts. *Id.* Because the agreement failed to specify the geographic area, the agreement was be read *against* the Government. *Id.* "This does not mean," the Fourth Circuit emphasized,

> that in a proper case it might not be possible to establish by extrinsic evidence that the parties to an ambiguously worded plea agreement actually had agreed -- or mutually manifested their assent to -- an interpretation as urged by the Government. But here, that evidence simply does not exist. On the contrary, as has been developed, the evidence shows at most an honest conflict of understandings and intentions that is best explained by the ambiguity itself.

*Id.*

*Harvey's* reasoning supports Alfredo. The functional equivalent of ¶¶ 4-5 in the instant case's agreement is found in *Pielago*, where the Eleventh Circuit majority, reading similar provisions together,

interpreted them to mean that the prosecution could not *directly* use "the statements and information from [defendant's] proffer against her," yet was free "to use evidence *derived* from her proffer statements against her." *Pielago*, 135 F.3d at 710 (emphasis added). That would be the result here if only ¶¶ 4-5 existed.

But ¶ 6 throws a monkey wrench into the mix; under it the government has promised Alfredo that, so long as he gives the government "truthful and complete statements, no information or documents which you disclose will be used against you, directly or indirectly, in a criminal case...." Doc. 68-3 at 3. No one claims Alfredo has not given truthful and complete statements here. And ¶ 6 obviously *does* conflict with ¶¶ 4-5. *Pielago* instructs that "no term of a contract should be construed to be in conflict with another *unless* no other reasonable construction is possible." *Pielago*, 135 F.3d at 710 (emphasis added). No other reasonable construction is possible here (¶ 5 says the government can use information against Alfredo that it *derives* from Alfredo's "sit-down-session" disclosures to the prosecution, yet ¶ 6 then prohibits the government from using anything indirectly  -- i.e., *derived*

from what he said -- against him).  Under both *Pialego* and *Harvey*, any ambiguity must be construed against the government.

From both its oral and brief-bound arguments the government also interprets the agreement as prohibiting it, under ¶ 6, from using against Alfredo "any information or documents which [Alfredo] disclosed . . . directly or indirectly, in a criminal case."  Indeed, the government has insisted that it obtained much of its grand jury presentation information from independent sources.  For example, it pointed out that Mederos was arrested in April 2008 -- the month before its first sit-down with Alfredo. Doc. 127 at 22 (though the Court notes her arrest warrant was not signed until August 14, 2008, *see Mederos*, No. CR408-232, doc. 2). Further, it interviewed Mederos "at the time of her arrest," and based on the information she provided, agents obtained search warrants in Florida and the fruit they bore was furnished to the grand jury.  *Id.* at 22-23; *but see id.* at 23-24 (Mederos, however, was not "comprehensively debriefed by the government" until May 20, 2009, over a year after its sit-downs with Alfredo.)

Hence, the parties by their conduct (in oral and written arguments) show where their minds met as to the reach of the August 26, 2008 agreement: The government cannot directly or indirectly use Alfredo's information against him. In other words, ¶ 6 in fact does limit ¶ 5, to the point of neutralizing it.

## C. Alfredo's Dismissal Motion

Superilluminating ¶ 6 and citing *United States v. Farmer*, 543 F.3d 363 (7th Cir. 2008), *United States v. Schwartz*, 541 F.3d 1331 (11th Cir. 2008), and *Pielago*, Alfredo correctly reminds the Court that for proffer agreements like his the Court must apply both ordinary contract and due process principles to ensure bargaining process integrity. Doc. 68 at 3. He cites to an agreement in another case where the prosecution "only guarantee[d] that [the defendant's] statements will not be used against him in the government's case in chief," *Schwartz*, 541 F.3d at 1356, doc. 68 at 4, then emphasizes that *no such* limitation exists in *this* case, which "precludes the government from using statements made during the proffer session *directly or indirectly*, absent an untruthful or incomplete statement." *Id.* Basically claiming that the first superseding indictment

is the direct or indirect product of his protected proffer statements (he would later argue this for all superseding indictments), Alfredo (in motion # 68) thus wants the Court to "dismiss all counts of the original and superseding indictments in which he is charged." *Id.* Otherwise, "all statements made by [Alfredo] during the proffer sessions should be held inadmissible at trial," he contends. *Id.* at 5.

The government responds, in essence, that Alfred's motion # 68 is frivolous. Doc. 72. Alfredo, it contends, simply ignored the fact that the first and superseding indictment's information came from, in addition to independent sources, Alfredo's *unprotected* May 30, 2008 conference with the prosecutor: against his own attorney's advice, Alfredo met with the prosecutor following his arrest but before his indictment and provided inculpatory information. Doc. 72 at 1-2. There was *no* proffer protection agreement and thus no Rule 410 protection, it contends. *Id.* at 2.

The government next underscores the fact that it indicted Alfredo and Niurka on June 6, 2008. Doc. 11. Only on August 26, 2008, it emphasizes, did Alfredo meet with the prosecutor *with* a proffer protection agreement. Doc. 72 at 2. Next, the government points out, it

then separately indicted Riccy Mederos on September 12, 2008. *Mederos*, No. CR408-232, doc. 6. It later combined the Rasco and Mederos prosecutions in a superseding indictment in this (*United States v. Rasco*, No. CR408-100) case. *See* doc. 38 (Superseding Indictment filed Oct 9, 2008). Thus, the government concludes, Alfredo's claim that his first meeting with the prosecutor was protected is just plain *false*. Doc. 72 at 4-5. And the whole purpose of the next (August 26, 2008) "protected" meeting, says the government, was for Alfredo to provide information about Riccy Mederos, not himself -- as reflected in the *Mederos* grand jury transcript. Doc. 72 at 7. For that matter, Alfredo failed to meet L. Cr. R. 12.1's verification requirement (by attaching a supporting affidavit supporting the facts alleged).[11] *Id.* at 3. Worse, Alfredo contends that the government breached the August 26, 2008 proffer agreement and cites a grand jury transcript as "proof" when in fact that is the *wrong* transcript; it relates to the indictment of Riccy Mederos -- the object of Alfredo's protected proffer meeting -- *not* Alfredo. Doc. 72 at 7.

---

[11] This argument is rejected outright. The gravamen of Alfredo's complaint here goes to what occurred in the *record* of this case, not his personal knowledge.

Next, the government furnishes a June 2, 2008 FBI summary of Alfredo's May 30, 2008 interview, doc. 72-6, and provides the following superseding-indictment grand jury transcript cites to show that each of that transcript's references to Alfredo's statements comes from his May 30, 2008 interview and not his August 26, 2008 proffer. Doc. 72 at 8 ("[1]3, line 13; p. 14, line 6; p. 28, line 25; p. 29, line 8; p. 31, line 13; p. 35, line 23; and p. 36, line 7). And, it continues,

> [n]either does [Alfredo] acknowledge the significant cumulative weight of the evidence against him (both in the Superseding [hence, the Second] Indictment Presentation as well as previous Grand Jury Sessions specifically referenced therein) which the grand jury properly considered in making a probable cause finding with respect to the allegations contained in the superseding indictment. This is of particular importance *since no additional substantive charges were brought against Defendant Rasco in the superseding* [second] *indictment* and thus, no perceived harm can be properly alleged.

Doc. 72 at 8.

Alfredo responded by filing a copy of his August 26, 2008 "protected" interview, doc. 77-2, and it shows that Alfredo provided the government with rich detail on United Therapy, that he relied on Mederos on how to artificially inflate his infusion-business Medicare billings, doc. 77-2 at 1-2, that he misstated the amount of gamma

37

globulin billed to Medicare, falsified billing codes to exploit a loophole in the Medicare billing safeguard process, etc. *Id.* at 2-5. Months later, the government filed its second superseding (hence, the third) indictment on August 5, 2009. Doc. 118. Alfredo argues that this cures nothing, because the government still "used statements from [Alfredo] that he provided in his meetings with the government." Doc. 123 at 2. In reply, the government cites the August 5, 2009 (third indictment) grand jury transcript as proof that, in seeking its latest indictment, it "did not present any testimony concerning statements made by Defendant Alfredo Rasco during *either* of the two interviews with government agent." Doc. 124 at 3 (emphasis added). Thus, it contends, Alfredo's dismissal motion is moot. *Id.* at 4. And, it assures the Court that it will not use any of Alfredo's statements -- even those that he gave during the unprotected, May 30, 2008 interview -- at trial, whether it be during the government's case-in-chief of to impeach him should he testify. *Id.* It further assures the Court that it will not use any of any of Alfredo's August 26, 2008 interview statements during its case-in-chief (but

apparently reserves the right to use them to impeach Alfredo should he testify). *Id.* at 4-5.[12]

Paragraph 6 ("direct and indirect use") of the parties' proffer agreement imports the *Schmidgall/Kastigar* standards and applies them to the *second* (but not the first) sit-down information. That means that the government must trace all grand-jury presented evidence to sources wholly independent of that information. Based on the evidence cited *supra* and *infra*, the Court concludes that Alfredo has presented enough evidence to justify a *Kastigar* hearing. In fact, both he and the government have moved for sanctions: he wants the case dismissed outright, the government wants his counsel sanctioned for making outrageous accusations against it. As discussed *infra*, that also warrants a hearing.

### D. Government Misconduct

---

[12] Assuring the Court that tainted information will not be used at trial misses the mark. The *Schmidgall* cases demonstrate that (a) obtaining an *indictment* alone with tainted information can violate Rule 410 and any additionally agreed immunization protections; and (b) the remedy for such a violation can include judicial termination of the prosecution outright if no harmless error can be shown.

Again, because the ad hoc briefing has rendered this case difficult to follow, and Alfredo has repeatedly raised government misconduct accusations in his later filings, the Court will finish sorting it out. As noted *supra*, the Court arraigned the Rascos on the second superseding indictment on August 31, 2009 and held oral argument on Alfredo's Rule 410 motion. In his post-oral-argument brief, doc. 132, Alfredo reiterates (and updates with later-acquired information) his Rule 410 arguments and blends in a government-misconduct dismissal argument:

> The Motion to Dismiss should be granted because the government violated the [August 26, 2008] Proffer Agreement with [Alfredo] when it presented to the grand jury immunized statements, information, and documents in three ways. First, the government directly used information it learned only from [Alfredo] in securing the Second Superseding Indictment. Second, the government indirectly presented [Alfredo]'s information to the grand jury through co-conspirator Riccy Mederos's statements. Third, the case agent *falsely* testified to the grand jury that he interviewed a key witness when in fact no such interview occurred and the only source of that information was [Alfredo]'s *second proffer*. The motion in limine should be granted because the *second proffer* was made in the course of plea discussions with the government.

Doc. 132 at 1 (emphasis added). That and another allegation hit home with the government, which has since demanded (in its brief, but not in a formal motion) sanctions against defense counsel:

40

Defendant makes a number of wild allegations about this case, and false accusations against the undersigned Assistant United States Attorney and the case agent, including claims that the Government intentionally misrepresented facts during the motions hearing on August 31, 2009, and libelously false and outrageous claims that the undersigned and the lead case agent *suborned perjury and committed perjury* before the Grand Jury. These claims are so entirely without merit that they are worthy of sanctions by this Court.

Doc. 136 at 2 (emphasis added); *see also* doc. 72 at 4-6 (prior government brief also citing sanctionable misconduct for misleading this Court). Also following oral argument, the government reconvened the Grand Jury and filed a *third* superseding indictment (hence, its fourth indictment). Doc. 137.[13] Undeterred, Alfredo responds that "[w]hether its statements

---

[13] Here a new defendant -- Iris Oswald -- is added, and she is alleged to be the owner, chief executive officer, etc. of United Therapy, while Niurka is still identified as United Medical's owner, CEO, etc. Doc. 137 at 1. Alfredo, however, "operated and controlled" both. *Id.* at 2 ¶ 3. The three are alleged to have aided and abetted the medicare fraud scheme described *supra*, and thus all three are reached by Count One ("Conspiracy to Commit Health Care Fraud 18 U.S.C. §§ 1349 & 2") and by Counts 2-55 ("Healthcare Fraud 18 U.S.C. §§ 1347 & 2"). The Grand Jury also indicted Alfredo and Oswald for Aggravated Identity Theft (18 U.S.C. § 1028A) in Counts 56-58, all three of them for that charge in Count 59, and Niurka for False Statements (18 U.S.C. § 1001) in Count 60. *Id.* at 2-15; *see also id.* at 15-17 (Forfeiture Allegations). At the October 29, 2009 arraignment on this indictment, the government explained that, among other things, this latest indictment unbundles some counts that had previously packed multiple charges within them. No defendant has since renewed any "duplicitous" challenges, nor sought severance.

to the court and to the grand jury and its direct and indirect use of [Alfredo]'s proffer statements are intentional, reckless, mistaken, or confused, the government's indictment and prosecution of [Alfredo] seems riddled with irreversible and prejudicial errors." Doc. 145 at 1.

Given the sanctions sought, the Court will parse the post-August 31, 2009 hearing briefs. Alfredo's first post-hearing brief proceeds on the following factual assertions: At the May 30, 2008 proffer session with the government, both Alfredo and his counsel "understood the purpose of the meeting was to evaluate the information [Alfredo] possessed and his credibility as a witness, and that it carried certain protections, including that the information would not be used against [Alfredo]. The government acted consistently with this understanding and the resulting protections." Doc. 132 at 2 (footnote omitted).

At that meeting, Alfredo disclosed his involvement in United Therapy, plus general information about others in the fraudulent scheme, including eventual co-conspirator Mederos. *See* doc. 77 (attached "Report of Interview"). Mederos had not yet been arrested. Alfredo offered to plead guilty to avoid indictment of him and Niurka.

*Id.* No deal was reached. The government then indicted Alfredo and Niurka in June 2008, *see* doc. 11. Doc. 132 at 2.

Further negotiations produced the formal proffer letter excerpted *supra*, and the two sides met again on August 26, 2008. *Id.* at 3-4. Alfredo says that he successfully had ¶ 6 added, over a prior draft of the agreement, to address his counsel's concern that government not use his statements "at trial in its case [in] chief and not for additional prosecution based on information [Alfred] provided"[:] 'Provided you give truthful and complete statements, *no information or documents which you disclose will be used against you, directly or indirectly, in a criminal case.*' (Emphasis added)" Doc. 132 at 4 (quoting ¶ 6).

From this point on the parties dispute the facts. Alfredo says he substantially assisted the government during and after that second meeting. "The day after the meeting, [his] counsel sent to the government examples of Medicare claim forms that [Alfredo] falsified in Florida to reflect certain diagnostic code, as this had been one of the primary topics at the second proffer." *Id.* at 4. That information made its way into succeeding grand jury presentations. And the core of the

latest indictment, he contends, is *still* constructed on statements traceable to him, not a wholly independent source. Doc. 145 at 7 ("The government's repeated and blatant mistakes and misuse or immunized testimony has created insurmountable obstacles for a fair prosecution of [Alfredo].").

Meanwhile, Alfredo amps up his government misconduct charge. Now he insists that one of the government's representations to this Court during the August 31, 2009 hearing are "simply false." He cites this assertion by government counsel: "But I believe Mr. – [FBI] Agent [Mark] Alig informs me that Ms. Mederos was first interviewed and arrested prior to [Alfredo] ever having been interviewed." Doc. 127 at 20-21 (Aug. 31, 2009 Tr.), partially quoted at doc. 132 at 5.[14] Alfredo then sharpens his accusation:

> The government needed to take this position to prevail on its argument that the government [to show non-taint under Rule 410's

---

[14]    Interestingly, Alfredo fails to quote the government's next sentence: "He did not -- *she* did not provide details of the United Therapy and United Medical...." Doc. 127 at 21 (emphasis added). This assists his dismissal/exclusion argument because the government is admitting that Mederos did *not* provide details that Alfredo claims he provided and that the government used to indict and re-indict him in violation of the proffer agreement.

standards] was aware of the extent of Mederos's involvement in United Therapy *prior* to its *meetings* with [Alfredo]. The government went so far as to state that this Court signed the arrest warrant in March or April 2008 and that Mederos appeared before this Court before [Alfredo] did. (Ex. 2, 8/31 Trans. at 22-23).[15] These statements are simply false and highlight the government's efforts to misconstrue the facts of this case to cover up its unavoidable reliance on [Alfredo]'s immunized information.

Doc. 132 at 5 (emphasis and footnotes added).

––––––––––––––––––

[15]    Alfredo's factual assertions are supported here.  In a motion to seal that this Court granted, the government states that the Court signed Alfredo's arrest warrant on May 15, 2008.  Doc. 6 at 1 ("That on May 15, 2008, this Court issued an arrest warrant based on a written affidavit sworn to by Special Agent Joshua W. Hayes of the Federal Bureau of Investigation."); *see also* doc. 127 at 22.  The Court later unsealed that document, doc. 9, yet it remains sealed.  The Clerk is **DIRECTED** to unseal it.

In any event, the record shows that Alfredo was arrested after May 15, 2008 and first appeared before this Court on June 26, 2008.  Doc. 18.  Mederos's arrest warrant was not signed until August 14, 2008.  *See Mederos,* No. CR408-232, doc. 2. And the government indeed insisted, at oral argument, that "Mederos was first interviewed and arrested *prior* to [Alfredo] ever having been interviewed." Doc. 127 at 21 (emphasis added).  The record suggests the opposite.  The government also insisted that the undersigned signed the Mederos warrant.  *Id.* ("[the arrest] was out of this district, but the warrant was signed by yourself.").  But moments later, the government represented: "Your Honor, [FBI] Agent Alig has advised me that the original complaint with respect to Ms. Mederos that was issued by Your Honor was *around April of 2008*.  It included a number of different schemes to defraud Medicare, and number of different clinics, as Agent Alig has outlined, including United Therapy and United Medical."  *Id.* at 22 (emphasis added).  However, no docket entry supports those representations.  Again, *see Mederos,* No. CR408-232, doc. 1 (Complaint filed Aug. 14, 2008); *id.,* doc. 2 (arrest warrant signed on Aug. 14, 2008).

In fact, Alfredo maintains, this Court did not even sign the Mederos arrest warrant until August 14, 2008, well after Alfredo's first (May 30, 2008) meeting with the government. *Id.* And Mederos herself was not even arrested until August 21, 2008; nor did she appear before *this* Court until after the next superseding indictment in September 2008. *Id.* at 5-6. True, she may have been under general investigation in South Florida, "but the import of her involvement with United Therapy did not become apparent until [Alfredo] met with the government. As apparent from the face of the Criminal Complaint, which has minimal details about the operation of the United Therapy scheme, particularly as compared to the details about the Visbal Clinics,[16] the government was not aware of the details of Mederos's involvement in United Therapy until [Alfredo]'s second proffer in August 2008." *Id.* at 6 (footnote added). These "misrepresentations" are crucial to Alfredo's motion:

---

[16]  The August 14, 2008 Criminal Complaint filed in *Mederos* was supported by a comprehensive affidavit relating, *inter alia*, the assertion that in August 2007, "Ricardo R. Visbal-Iglesias signed and submitted a Medicare Enrollment application on behalf of a company called Savannah Medical Services (SMS). SMS became a participating Medicare provider upon the completion and submission of a Medicare Enrollment Application." *Mederos,* No. CR408-232, doc. 1 at 5 The affidavit goes on to relate how SMS became part of the same Medicare fraud scheme described above.

46

The government's misrepresentation to the court about the dates of its investigation into Mederos should not be dismissed as faulty memory or inadvertent confusion about dates. The government can only save the Second Superseding Indictment if it can show it learned of Mederos's involvement in United Therapy independent of [Alfredo]'s proffers.[17] Whether due to faulty memory or intentional misrepresentation, the fact is that Mederos was not arrested until well after [Alfredo] met with the government,[18] and even that arrest seems primarily dependent on her involvement in the Visbal Clinics, not United Therapy. Moreover, the government had the benefit of Rasco's first proffer, which also claimed certain protections.

*Id.* at 6 (footnotes added).

And, Alfredo reminds, "[t]he government did not present the Mederos indictment until after [Alfredo's] second proffer. Agent Alig's grand jury testimony was replete with [Alfredo's] statements and information. Securing the indictment against Mederos rested in large part, if not entirely, on [Alfredo's] proffer to the government." *Id.* (record cites omitted).

Next, Alfredo contends, "[t]he government's use of [Alfredo]'s statements and information against Mederos in a separate criminal case

---

[17] As noted *supra*, Alfredo is overstating his case here. The first proffer was protected only by Rule 410's ban against the direct use of his statements.

[18] Alfredo is being noticeably vague here. "Met with the government" is a critical phrase with respect to the second sit-down, not the first.

was entirely consistent with the terms of the Proffer Agreement. However, it soon became apparent that the separate Mederos indictment was simply a procedural guise to use [Alfredo]'s statements in seeking additional charges against him." *Id.* at 6-7. Subsequent "repair" indictments were cagily obtained,[19] he says, yet never escaped the fact that each was constructed on information the government obtained at least indirectly from him. *Id.* at 7. That information includes:

1. Alfredo's second sit-down statements (protected by ¶6 of the proffer agreement) to the government about false diagnostic codes -- information he insists "is critical to understand the operation of the scheme." *Id.* at 8. The false diagnostic codes are not mentioned in the first indictment but appear in the subsequent  second superseding indictment. Hence, it is a reasonable inference that the government learned of these facts only from Alfredo's *second* proffer. And the Mederos interview report shows that she never provided this information to the government. *Id.* at 10. Alfredo says this is an example where the

---

[19] "[T]he testifying agent," Alfredo insists, "carefully crafted his testimony to state these facts without attribution." Doc. 132 at 19.

government *directly* used his own information against him, thus violating ¶ *5* of the proffer agreement. *Id*. at 18-19.

2. Next, Alfredo "was the only source who informed the government Mederos advised him to open the clinic outside of Florida to avoid detection." *Id*. at 10. This is another direct violation of the agreement, he argues. *Id*. at 19.

3. Alfredo also informed the government about Dr. Wilbert Jenkins's role in the United Therapy clinic. Jenkins was *never* interviewed by any government agent. Yet, the government's agent (Alig) allegedly falsely testified before the grand jury that it *had* interviewed Jenkins -- all in an attempt to disguise the fact that it had obtained information about Jenkins from Alfredo. *Id*. at 11-2.

4. When the government first indicted Mederos in September 2008, based on Alfredo's cooperation with the government, she showed no signs of cooperating with the government until she met with federal agents and the lead prosecutor on May 20, 2009. Present at that meeting were Agents Hayes, Graupner, and Alig, all of whom had attended at least one of Alfredo's proffer sessions. No effort was made to shield his

immunized testimony from the agents interviewing Mederos -- they were the very same agents. Alig later presented (to obtain the next superseding indictment) "virtually the same testimony he had in prior grand jury testimony, except crediting the information to Mederos rather than to Alfredo." *Id*. at 9-12.

For that matter, Alfredo further argues, the government cannot use Mederos to launder Alfredo's information, as that would constitute a breach of its proffer agreement promise not to use Alfredo's information *indirectly* against him. *Id*. at 19 (citing *Hampton*, 775 F.2d at 1488); *see also id*. at 19-20 (citing *Schmidgall* I, 25 F.3d at 1528).

Finally, Alfredo flat-out accuses the government of advancing perjury to the grand jury. At the August 5, 2009 (hence, second superseding indictment) grand jury,

> [a]gent Alig testified Dr. Wilbert Jenkins was interviewed in the course of the investigation and then offered information from that interview to support counts thirty-two and thirty-three of the indictment. (Ex. 15 at 15)[20] That information is the lone evidence

---

[20]    The grand jury transcript (doc. 132, ex. 15 at 15) offers some support for this assertion. Count 32 of the second superseding indictment says: "On or about November 8, 2006, in Chatham County within the Southern District of Georgia, and elsewhere, Defendant ALFREDO F. RASCO, aided and abetted by others, did knowingly possess and use, without lawful authority, a means of identification of

offered in support of two of the courts in the indictment and is imminently material in securing these counts in the indictment. In fact, the government never interview[ed] Dr. Jenkins . . . and the only source of the information offered to the grand jury was [Alfredo]. Agent Alig's false statements to the grand jury rise to the level of perjury. This action was improper and an abuse of the government's grand jury power, requiring dismissal of the indictment.

*Id.* at 22 (footnote added).[21]

He asks this Court to therefore dismiss the indictment on those (government misconduct) grounds alone. *Id.*[22] Otherwise, he concludes,

---

'W.J.', a medical doctor, during and in relation to the violation of Title 18, United States Code, Section 1347 referenced in Count Four of this indictment." Doc. 118 at 10. Count 33 is similar. *Id.*

[21] To refute this the government points to, for example, an April 9, 2008 investigative report, doc. 136-4, but that merely mentions that Jenkins was United Therapy's first medical director for a six month period and "had no involvement with the infusion therapy." *Id.* at 1. It also cites a June 2008 grand jury transcript, doc. 136-3, but that simply shows testimony to the effect that the Rascos and Mederos misused his name. The same may be said for doc. 136-5 (May 21, 2008 investigative report merely referencing that Jenkins was United Therapy's "first physician to work" there); and doc. 136-6 at 2 ("Dr. Jenkins worked for a short period of time at UT visiting the office once or twice a week at the start of UT"). The remainder of the government exhibits fall after the May 30 and August 26, 2008 sit-downs with Alfredo. Thus, the Court discerns no evidence rebutting Alfedo's charge that Agent Alig testified to the grand jury (about the misuse of Dr. Jenkins's Medicare identification data) based on evidence *not* independent of what the government learned from Alfredo. That certainly does not mean that he testified falsely before the grand jury, but it also does not prove he did not. What it does mean is that Alfredo's accusation is supported by enough evidence to warrant a hearing and deny the government's request for sanctions.

51

the Court should dismiss the indictment for the government's breach of

[22] The government cites *United States v. Belcher*, 927 F.2d 1182, 1185 (11th Cir. 1991) (on sufficiency of indictment challenges court must accept indictment's factual allegations as true and must not rely on extrinsic evidence), and cases like *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("There is no summary judgment procedure in criminal cases."), doc. 72 at 4 n. 2, but these cases are inapposite. Government misconduct means the "government['s] conduct was so outrageous that it violated due process. . . ." *United States v. Valencia Vergara*, 264 F. App'x 832, 834 (11th Cir. 2008); *United States v. Tobias*, 662 F.2d 381, 385-87 (5th Cir. Unit B Nov. 1981). On such an allegation the defendant need only adduce enough evidence to establish a prima facie case for the government to rebut. *United States v. Moses*, 219 F. App'x 847, 849 (11th Cir. 2007) ("The bare conclusion that the United States Attorney was contemplating a criminal investigation does not establish a prima facie case of government misconduct. Moses presents no evidence that the contemplation of the United States Attorney, at the time of Moses's deposition, had reached any significant level."). And the Court applies the following standards for grand-jury based, government-misconduct claims:

> As a general rule, district courts "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant [ ]." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988). Thus, an indictment should be dismissed only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256, 108 S.Ct. at 2374 (quotations and citation omitted). We have further indicated that "the possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct." *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir.1985).

*United States v. Pettway*, 129 F. App'x 583, 589 (11th Cir. 2005); *see also id.* at 588-89 (indictment charging drug conspiracy offense was not required to be dismissed based upon alleged false statements made by police detective at grand jury proceeding, where police detective admitted during his trial testimony that his grand jury testimony was incorrect, he explained why it incorrect, and there was no evidence that detective knew that the statements to the grand jury were false at the time he made them).

the proffer agreement, which is thus a breach of his Fifth Amendment right against self-incrimination. *Id.* at 22-23.

The government denies Alfredo's perjury accusation and seeks sanctions for making them. Doc. 136 at 4-5. In fact, it asserts,

> agents testified similarly about the use of Dr. Jenkins's identity to commit health care fraud in three prior grand jury sessions -- in June 2008, September 2008, and in October 2008.[23] Defense counsel has these transcripts, even cites to portions of them in Defendant's Supplemental Brief, and yet *does not even bother* to reference those portions of prior Grand Jury proceedings where the very same testimony was offered in the Grand Jury as part of her false accusations of perjury and suborning perjury. Instead, defense counsel states that she conducted a telephonic interview of Dr. Jenkins, claims that Dr. Jenkins advised her that he had not been interviewed, from which defense counsel leaps to the conclusion that that the undersigned must have suborned perjury and the case agent must have perjured himself in the Grand Jury.

*Id.* at 5-6 (emphasis and footnote added).

On top of that, insists the government, Jenkins is not a trustworthy character (for Alfredo himself told investigators that Jenkins "began coming into the office drugged up," was "dealing with some sort of sexual harassment issue," and suffered a medical license

---

[23] Yet, the government does not address Alfredo's accusation -- that Agent Alig falsely testified to the grand jury that agents had *interviewed* him.

suspension over his own misconduct), so defense counsel's reliance upon him was unjustified. *Id.* at 6. The government also interviewed Jenkins (in response to Alfredo's accusations here) and has learned that, yes, he did tell defense counsel that he had not been interviewed by government agents, *but* when defense counsel asked him to sign an affidavit on that score he refused. *Id.* at 6-7. That fact, not disclosed by defense counsel, further undermines support for Alfredo's charge that the government suborned perjury. *Id.* at 7. Finally, Jenkins backpedaled:

> at the conclusion of the interview by Government agents, Dr. Jenkins stated that in view of the many agencies that interviewed him in the past, he was "probably" interviewed by Government agents about United Therapy as well, and in any event, confirmed the essential facts alleged in the Second Superseding Indictment-- he was not involved with infusion therapy at United Therapy, and did not grant anyone at United Therapy, including Alfredo Rasco, permission to use his identity to bill for infusion therapy services.

*Id.* at 7.

And the government shows from multiple witness statements dating back to April 9, 2008, as well as United Therapy "superbills" going back to 2006, that Jenkins had not been *present* during the infusion therapy "treatments" that support the indictment here. *Id.* at

54

7-9.[24] Defense counsel, the government emphasizes, had this information before raising her perjury claims. *Id.* at 9.

Next, the government shows that the "relocation" claim (relocating United Therapy from Florida to Georgia) is now moot because it is omitted from the third superseding indictment (but even so, agents learned of this from one Michael Visbal on July 1, 2008). *Id.* at 10-11.

Firing back, Alfredo again insists that the government has committed repeated and blatant mistakes, if not engaged in outright misconduct, thus justifying dismissal of the indictment. Doc. 145 at 1-7. He points to Riccy Mederos, who presumably will now testify against Alfredo at trial:

> [A]s Agent Alig stated, he was involved in the arrest of Mederos and subsequent search warrants, and no one had any reason to believe he would make false statements to this Court. In fact, *he did*. As the government does not now dispute, those key events occurred in late August, 2008, well after [Alfredo] was arrested,

---

[24] Noticeably, the government does not rebut Alfredo's charge that it presented grand jury evidence of Alfredo's *misuse* of Jenkins' identity data; it has never been disputed that Jenkins was or was not "present" for some of the time that the alleged crimes occurred. And again, the government is still failing to rebut Alfredo's charge that Alig told the grand jury that agents had interviewed Jenkins, when in fact they had not. (Alfredo says that this is a lie, aimed at bogusly attempting to show that the government learned of the Jenkins identity data misuse from Jenkins and not Alfredo.)

indicted, and met with the government. The important fact is that Mederos was not arrested until months *after* [Alfredo's] first proffer, at which time he educated the government about her involvement in the United Therapy business. Mederos was not indicted until after [Alfredo's] *second* proffer with the government, at which time he provided *critical* details about Mederos's role in United Therapy. These unavoidable facts dispel the government's position that it knew the extent of Mederos's involvement in United Therapy before its proffers with [Alfredo] and establish Mederos's statements were derived indirectly from [Alfredo]'s protected statements.

*Id*. at 2-3 (emphasis added). And as for Dr. Jenkins:

The fact is that Dr. Jenkins was not interviewed about his involvement in this case when the government stated to the grand jury that he had been interviewed, and the grand jury relied on said statements to indict [Alfredo]. The government's failure to disclose this false statement to the grand jury or to this court, once it became aware no such interview occurred, casts serious doubt [about] the government's claimed good faith.

*Id*. at 3.

For that matter, defense counsel contacted Jenkins solely to determine whether he had been interviewed by government agents. Jenkins said no, but did not want to get involved so he refused to sign an affidavit. *Id*. at 3 n. 2. "Apparently, when confronted at his doorstep by federal agents, Dr. Jenkins ultimately said he 'probably' had been interviewed about United Therapy. The government is in the best

position to know whether any such interview occurred, and it has presented no evidence of any such interview." *Id*.

But the government, Alfredo insists, further dug itself into the dishonesty hole:

> The government attempts to minimize the impact of its false statements to the grand jury by asserting [that Alfredo] never objected previously to prior grand jury testimony about Dr. Jenkins and that other evidence (not presented to the grand jury) may exist supporting counts thirty-two and thirty-three. The government misses the point. Although it had been to the grand jury three prior times, this is the first time the government made patently false statements about Dr. Jenkins --- that he had been interviewed and made statements supporting the allegations in the indictment. That was the only evidence presented to this grand jury in support of counts thirty-two and thirty-three in the second superseding indictment. The government is the sole source of information for the grand jury, and the grand jury must rely on the testimony of the agent summarizing the investigation supporting the indictment. The government cannot avoid its false statements by asserting that other evidence, *not submitted* to the grand jury, supports the grand jury's decision to indict. Here, the agent falsely testified that an interview occurred and recounted statements from that interview as the sole basis for the allegations. This abuse of the grand jury process, particularly in light of the other errors (whether intentional or careless) concerning the Second Superseding Indictment, support dismissal of the indictment here.

*Id*. at 4-5 (footnote omitted; emphasis added).

The United States has *not* responded to these assertions.

### E. The Rule 410/Kastigar/Misconduct Hearing

Alfredo's filings are far from frivolous, much less sanctionable. Indeed, they suggest a reasonable possibility that ¶6, which in substance upholds his Rule 410/*Kastigar* rights, was violated. And under ¶6 it is the *government's* burden to show (by tracing, etc.) that it did *not* violate ¶6 with respect to second-sit-down information. The briefs and argument presented to the Court thus far have it somewhat backwards: Alfredo is trying to show how the government *did* violate ¶ 6, which is useful but understandably lacks the tracing component; the government has merely responded "no we did not" and claims to have mooted much by re-running its grand jury presentation without mentioning Alfredo's name and claiming Mederos and other "independent" sources -- a tactic that obviously does not satisfy the tracing/untainting requirement. *See Hampton*, 775 F.2d at 1487-89.

Furthermore, perjury before the grand jury of course cannot be permitted, much less misleading the Court. Alfredo's government-misconduct accusations are not utterly unfounded, as evidenced by the record cites set forth above. Hence, no sanctions against defense counsel are therefore warranted. What is warranted is an evidentiary hearing on

Alfredo's Rule 410/*Kastigar* violation claim and government misconduct contentions -- to be preceded by a pre-hearing government brief bearing meticulous tracing citations and a *sworn* rebuttal to Alfredo's misconduct assertions. Under the standards set forth above, the government must show -- using Rule 410/*Kastigar* level tracing as described above -- that it did not violate ¶ 6 with respect to Alfredo's second sit-down information. It also must show that it did not advance perjury before the grand jury, and that it did not lie to or otherwise mislead this Court. The government's brief is due 30 days from the date this Order is served. Alfredo may file a *single* response within 10 days and the government a *single* reply to that response within 5 days thereafter. The Clerk shall then set the matter down for a hearing.

To that end, the parties' briefs shall also focus on what remedies exist when a plea-bargain contract is breached. In the typical case consideration for the contract fails because one of the exchanged promises is not kept. But courts do not reflexively rule that the parties' minds never met and thus rescission is automatically warranted. *Puckett v. United States*, ___ U.S. ___, 123 S. Ct. 1423, 1430 (2009). Rescission

(including, if the case proceeded that far, withdrawal of a guilty plea) may be proper, but not always. *Id* at 1430 & n. 5; *see also In re Arnett*, 804 F.2d 1200, 1204 (11th Cir. 1986) ("Where the government has not honored a plea agreement, the fashioning of an appropriate remedy is left to the sound discretion of the court."); *United States v. Tobon-Hernandez*, 845 F.2d 277, 281 (11th Cir. 1988) (ordering specific performance upon government's breach); 22 C.J.S. CRIMINAL LAW § 495 (*Remedies for breach*) (2009) ("A major factor in choosing an appropriate remedy for a breach of the plea agreement is the prejudice caused by the breach to the accused."); PROSECUTORIAL MISCONDUCT § 7:29 (Breach of plea bargain--Remedies for breach--Vacating plea) (2d ed. 2009.)

Rescission is specifically warranted, however, where it is shown that the government "inten[ded] at the time of contracting not to perform." *Puckett*, 123 S.Ct. at 1430 n. 5. Alfredo understandably does not seek rescission but instead requests an outright dismissal of the indictment based on both violations of Rule 410 (and the proffer agreement) and government misconduct (grand jury perjury, lying to this

Court) grounds; alternatively, he seeks exclusion of evidence (his "in limine" motion).

Dismissal certainly is a sanction for governmental misconduct, *United States v. Hernandez*, 312 F. App'x 937, 938 (9th Cir. 2009) (acknowledging that dismissal of an indictment based on perjury before a grand jury is an option, but "there was sufficient non-perjurious testimony ... to support the indictment, and therefore dismissal on that ground was not justified.") (quotes and cite omitted), and also for a Rule 410/proffer agreement violation if untainted re-indictment is infeasible.

## III. <u>CONCLUSION</u>

The Court **DENIES** as moot (in light of all of the superseding indictments that have been filed since) the Rascos' joint motion to dismiss counts 1-31 of the original indictment, doc. 36, and their joint dismiss counts 2-77 of the superseding indictment. Doc. 54. Motions 68 and 70 are restored to the pending motions docket. Motions 67, 68, 70 and 77 are now consolidated and construed as a motion to dismiss/exclude based on alleged Rule 410/proffer agreement violations.

Those motions are **DEFERRED** and will be reached after the re-briefing and forthcoming Rule 410/*Kastigar* hearing.[25]  Finally, the Clerk is **DIRECTED** to comply with the Court's May 29, 2008 unsealing Order. Doc. 9.  The Clerk shall also unseal, absent a motion opposing such within 10 days of the date this Order is served, all of the sealed documents in *United States v. Mederos*, No. CR408-032.

     **SO ORDERED** this __20th__ day of November, 2009.


                                    __s/ G.R. SMITH__
                                    **UNITED STATES MAGISTRATE JUDGE**
                                    **SOUTHERN DISTRICT OF GEORGIA**

---

[25]  Of course, a hearing may become unnecessary should all disputed matters be resolved by a government-prompted dismissal of the superseding indictments, a subsequent plea agreement, etc.